**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

2012 FEB 10 PM 3:30

IRVING McKENNIE JR. #934038,
              **PLAINTIFF,**

-vs-                                **CASE NO.  A-09-CV-906-LY**

**TEXAS DEPARTMENT OF CRIMINAL**
**JUSTICE and BRAD LIVINGSTON,**
**in his official capacity as Executive Director**
**of the Texas Department of Criminal Justice,**
              **DEFENDANTS.**

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BE IT REMEMBERED that on Monday, June 20, 2011, this Court called the above-styled

cause of action for trial.  Plaintiff Irving McKennie Jr. appeared by counsel Scott Medlock and Brian

McGiverin, and Defendants Texas Department of Criminal Justice and Brad Livingston appeared

by counsel Ana Jordan and Carol Garcia of the Texas Attorney General's Office.  Trial was limited

to the issues of:  whether the Religious Land Use and Institutionalized Persons Act (the "Act")[1] was

violated by not permitting McKennie to congregate on the Sabbath with his fellow believers without

a religious volunteer present and whether the Act was violated by not providing McKennie with a

vegan diet.

        Having carefully considered the evidence presented at trial, the case law applicable to this

action, and the arguments and briefs of counsel, this Court concludes that McKennie failed to prove

by a preponderance of the evidence that the Act was violated when McKennie was not allowed to

---

[1] *See* 42 U.S.C. §§ 2000cc to 2000cc-5.

congregate on the Sabbath without an approved volunteer and was not provided a vegan diet.[2]  In

so deciding, the Court makes the following findings of fact and conclusions of law.[3]

### *Jurisdiction and Venue*

This is a civil action over which this Court has federal-question jurisdiction.  *See* 42 U.S.C.

§ 2000cc-1(a) (the Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 2201 (Declaratory

Judgment Act).  Venue is proper in this case, because the Austin Division of the United States

District Court for the Western District of Texas is a judicial district where the defendants reside or

where the defendants may be found.  *See* 28 U.S.C. § 1391(b)(1), (b)(3).

### *Plaintiff's Allegations*

At the time he filed his complaint, McKennie was an inmate incarcerated in the Beto Unit

of the Texas Department of Criminal Justice - Correctional Institutions Division.  McKennie has

sued the Texas Department of Criminal Justice and Brad Livingston, in his official capacity as

---

[2] Subsequent to trial, on September 2, 2011, McKennie was transferred from the Beto Unit to the Michael Unit and was enrolled in the Sabbatarian/Jewish service, which is allegedly held three times a month.  According to McKennie, there are fundamental differences between these practices and his faith, and he prefers to be returned to the Beto Unit.  The Court cannot and will not make any findings of fact or conclusions of law with regard to the services provided at the Michael Unit, as those claims are not properly before the Court.  This action also raises the question as to whether a justiciable controversy continues to exist in this case.  "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000)).  In this case, it is not absolutely clear that McKennie will never be returned to the Beto Unit.  In addition, none of the prison units offer its offenders a vegan diet, and McKennie continues to claim the Sabbath services provided him fail to meet his religious needs.

[3] All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

Executive Director of the Texas Department of Criminal Justice,[4] for injunctive and declaratory relief pursuant to the Act, the Texas Religious Freedom Restoration Act,[5] and the Equal Protection Clause of the Fourteenth Amendment.[6]

McKennie claims he has been a member of the Hebrew Israelite faith since the beginning of his incarceration. According to McKennie, Hebrew Israelites follow many of the religious practices of the Jewish faith and are among the larger community of Messianic Jews and Israelites, in that they recognize Jesus as a messiah. McKennie alleges, as part of the practice of his faith, he is required to keep a vegan diet, he must congregate for worship on the Sabbath and on holy days, and he would like to possess or wear a talith, a prayer shawl. According to McKennie, the Department denies him a vegan diet, prohibits members of the Hebrew Israelite faith to congregate or worship without a qualified outside volunteer if there are more than four Israelites in attendance, and denied him a talith until sometime after he filed this case. McKennie claims the Department permits other prisoners holding other religious beliefs to eat a diet consistent with their religious beliefs, congregate for worship without a volunteer, and possess and wear approved devotional items in violation of the Equal Protection Clause.

### *Procedural Background*

The Department moved for summary judgment. On May 24, 2011, the Court rendered an order granting the motion in part and denying it in part. Specifically, the Court granted summary

---

[4] The interests of the defendants do not diverge. They will be jointly referred to as the "Department." The Texas Department of Criminal Justice - Correctional Institutions Division will also be referred to as the Department.

[5] *See* TEX. CIV. PRAC. & REM. Code § 110.

[6] *See* 42 U.S.C. § 1983.

judgment with respect to McKennie's equal-protection claims, claims brought pursuant to the Texas Religious Freedom Restoration Act, and a claim brought pursuant to the Religious Land Use and Institutionalized Persons Act regarding possession of a talith. The only claims remaining for trial were McKennie's claims brought pursuant to the Act regarding the volunteer policy and the vegan diet.

FACTS

I.   **Agreed Stipulated Facts**

The parties agreed to the following facts:

1.   [ ] McKennie [ ] is incarcerated by the [Department] at the Beto Unit in Tennessee Colony, Texas.

2.   [ ] Brad Livingston is the Executive Director of the Texas Department of Criminal Justice.

3.   [ ] McKennie believes a vegan diet excludes animal flesh and animal by products such as meat, fish, chicken, milk, cheese, and eggs.

4.   [Department] policy requires prisoner congregations to meet in the presence of an approved "free world" volunteer, or [Department] staff, unless the congregation is subject to the *Brown v. Beto*[7] decree.

5.   The Hebrew Israelites' volunteer visits the Beto Unit to perform services on Tuesdays, not Saturdays.

6.   Muslim services can be led by Muslim offender coordinators if a religous volunteer or [Department] staff member is unavailable for their weekly holy day observances. Muslim offenders at Beto are able to congregate three times a week (including Jumah). According to [Department] policy, "Jumah is the most important worship event in Islam and shall be held on Fridays at the proper time."

7.   The sole reason Muslims are permitted to use Muslim offender coordinators when religious volunteers are unavailable is a consent decree [the Department] entered into in 1977. *See Brown v. Beto* [citation omitted].

---

[7] *Brown v. Beto*, No. 4:69-CV-074 (S.D. Tex. 1977).

8.      On April 30, 2011, there were approximately 224 Muslim offenders at the Beto Unit. [As of May 24, 2011, the number was 216].

9.      [Department] policy permits offender religious groups in [the Department] to possess [t]aliths.

10.     [The Department] is a state agency.

11.     [McKennie] currently claims to be an adherent of the Hebrew Israelite faith.

12.     [McKennie] was admitted into [the Department] in January 2001 and immediately assigned to the Beto Unit.

13.     [McKennie] on at least one occasion asked that his religious faith preference be identified as Messianic Yisraelite.

14.     It is [the Department's] food-services policy to make available three meal trays at every mealtime to general population: 1) a regular tray; 2) a meat-free tray; and 3) and [sic] a pork-free tray; and at every meal, one of the three possible options is offered to substitute the meat or pork entree on a rotational basis: 1) cheese, beans and bread; 2) hard-boiled egg, peanut butter and jelly; or 3) peanut butter and jelly, bread and beans.

15.     [The Department] does not offer a strict vegan food tray.

16.     [McKennie] has exhausted his claim that [the Department] is violating his right to exercise his religion because it does not provide a strict vegan food tray.

17.     [McKennie] voluntarily purchased non-vegan food items in the commissary between December 2008 and December 2010.

18.     [McKennie] regularly worships with other members of his chosen religion on Tuesdays.

19.     [Department] policy identifies the [t]alith as an approved devotional item.

20.     [Department] policy is not currently prohibiting [McKennie] from possessing a [t]alith.

21.     [McKennie] is currently in possession of a [t]alith.

## II.      Volunteer Policy

First, McKennie challenges the Department's policy that prohibits inmates to congregate without an approved religious volunteer.  McKennie testified at trial that he was raised in a Baptist Pentecostal family and attended church with his parents.  After McKennie graduated from high school and joined the Marines, McKennie seldom attended church.  McKennie restarted his religious journey after he was detained in the Tarrant County Jail in 1998, after being arrested for injury to a child. While confined in the Tarrant County Jail, McKennie learned about the Sabbath and dietary laws from another inmate.  McKennie began corresponding with the Assemblies of Yahweh and completed several religious programs made available to him at the jail.

When McKennie was transferred from the Tarrant County Jail to the Department in 2001, McKennie no longer considered himself a Christian.  McKennie was not sure what faith to claim. He admits he may have stated Christian when he entered Department custody but believes he stated Yisraelite.  After entering Department custody, McKennie designated his faith preference as Jewish. In January 2007, McKennie changed his faith preference to Messianic Yisraelite.  McKennie believes Messianic Yisraelites, Messianic Jews, African Hebrew Israelites, and Yahweh Brothers are the same.  He believes he listed Israelite/Messianic/Jewish on his request-to-change-faith preference.  For the year before trial, McKennie has considered himself an African Hebrew Israelite, but he has not formally changed his faith preference at the Department.  When McKennie is released from prison, he wishes to change his name to Ovadyah Ben Sar Malahk Ben Yisrael.

From 2001 to 2005 McKennie did not regularly attend religious services at the Department. Instead, he met with other offenders on the recreation yard for fellowship.  In 2005, he and another offender began meeting at the back of the chapel to fellowship during the 3:00 p.m. Saturday Non-

Denominational Christian service.  McKennie did not want to show disrespect to the Christian service, so he requested permission from Chaplain Kiser, chaplain of the Beto Unit, to fellowship in a side room during the time scheduled for Christian services.  McKennie was allowed to congregate in the side room, as long as there were no more than four offenders in the room.  As the group continued to grow, McKennie had to turn away other offenders seeking to congregate with him.  In 2006, McKennie was told his group, because of its size, would no longer be allowed to congregate without an approved volunteer.  McKennie only attended the Saturday Christian service one time after that.

Shortly thereafter, McKennie began looking for a religious volunteer.  McKennie started writing Charles Simpson, known by his Hebrew name as Sar Malahk, in 2006.  Sar Malahk was eventually approved as a religious volunteer and began meeting with McKennie and his group in November 2007.  The group meets regularly on Tuesdays.  After Sar Malahk began meeting with McKennie on Tuesdays, McKennie did not complain he could not practice his religion with his brothers on the Sabbath until he filed a grievance on June 10, 2011.

McKennie believes he cannot practice his religion if he cannot congregate on the Sabbath.  McKennie explained meeting on the Sabbath is important to help new members learn from the more learned members.  In addition, McKennie explains scriptures stress the importance of Sabbath fellowship.  He relies, in part, on his understanding that Yeshua (Jesus) and other "patriarchs of old" congregated on Saturdays to keep the Sabbath holy.

Sar Malahk, testified he is the religious volunteer who meets with Hebrew Israelite offenders at the Beto Unit.  According to Sar Malahk, he oversees the Hebrew Israelite ministries in Texas.  The main office in Texas for the Hebrew Israelite religion is located in Houston.  Sar Malahk or

another religious volunteer travels to the Beto Unit every Tuesday to oversee the fellowship services at the Beto Unit. Sar Malahk has been the volunteer coordinator at the Beto Unit for three years. Sar Malahk indicated there are no Hebrew Israelite volunteers in Texas available to travel to the Beto Unit on Saturday to conduct religious services.

Sar Malahk described the religious-conversion process for offenders at the Beto Unit. There is no official conversion process. Rather, the process is a matter of absorption in that offenders may visit the Tuesday services and be invited to join the religion. Absorption can occur overnight or over a period of time. Sar Malahk believes McKennie is sincere in his beliefs of the Hebrew Israelite religion. Sar Malahk testified McKennie is faithful coming to the Tuesday services and relaying the religious message to other offenders. At the time Sar Malahk met McKennie, McKennie was very knowledgeable about the religion and was serious about his faith.

Sar Malahk testified the Sabbath is significant for the Hebrew Israelite religion. He explained the Sabbath is a day of rest and is commanded by the Fourth Commandment. According to Sar Malahk, worshiping on a day other than the Sabbath is not sufficient. Sar Malahk asserted keeping the Sabbath holy includes congregating and gathering to praise, worship, and show adoration to the Creator. Sar Malahk repeated fellowship on the Sabbath is critical to his religion and allows embracing and sharing the religion with others. A typical worship on the Sabbath includes prayer, meditation, group songs, message of encouragement, and the spirit of fellowship.

When Sar Malahk began services at the Beto Unit few offenders participated. The services have grown to as many as 40 and currently include approximately 18 offenders. Sar Malahk considers McKennie as a "head brother," whose duties include opening and closing prayer, spreading the message to other offenders and extending invitations to other offenders. Sar Malahk indicated,

-8-

if McKennie is allowed to congregate without a volunteer on the Sabbath, Sar Malahk would provide the knowledge base so that the congregation can follow the mandates of their religion. Sar Malahk testified the congregation would know exactly what to do to properly observe the Sabbath in the absence of an approved volunteer.

Sar Malahk opined Messianic Yisraelites, Hebrew Israelites, African Hebrew Israelites and African Messianic Yisraelites are one and the same religion. Sar Malahk indicated these religions are similar to Judaism.

Ron McAndrew testified as an expert witness for McKennie. McAndrew has extensive experience as a warden in Florida prisons and jails. McAndrew expressed his opinions as to the importance of religious programs in prisons and jails. McAndrew has visited several prison units in Texas. He is aware Muslim offenders in the Department are allowed to congregate without an approved volunteer. McAndrew testified Florida offenders are allowed to congregate without a volunteer. He denied Florida had problems with any faith-based group. He denied allowing offenders to fellowship without a volunteer puts offenders in supervisory positions over other offenders. McAndrew suggested the offender leading the service could be rotated every week. In addition, he described the various volunteer positions offenders may hold in their weekly congregation. McAndrew also testified that nonreligious programs were held in the Florida prisons without a staff or volunteer, such as sex education and literacy classes. McAndrew stated the groups can be supervised by roving officers, which he described as a common correctional practice, or by the use of listening devices or video monitors. McAndrew opined viewing the recordings would not be a significant burden to the Texas prison system.

Robert Eason, Regional Director of Region II for the Department, testified with regard to the Department's volunteer policy requiring supervision of group religious meetings under Department Administrative Directive 07.30. The directive applies to all religions with the exception of the Muslim religion. Eason explained the Muslim religion is not required to have a volunteer due to the 1977 *Brown v. Beto* consent decree.[8] Eason testified that in 1977 the prison population in Texas was approximately 23,000-24,000. The population has grown to approximately 156,000. At the time the *Brown v. Beto* consent decree was entered, the Texas Department of Corrections had been using offenders as "building tenders." The "building tender" system placed offenders in positions of authority over other offenders. This practice subsequently ceased as a result of the *Ruiz* litigation.[9]

Eason testified religious volunteers are key to institutional security. Volunteers must complete a training class before being approved to lead services at the prison. Volunteers supervise the services and report rule violations. There have been little or no security problems resulting from the various religious services held at the prison over the last five years. The policy requiring an approved volunteer to supervise religious services promotes public safety, controls offenders, and enhances religious growth of the offenders.

There are 214 different faith groups in the Department and 74 faith groups at the Beto Unit. Eason estimates there is one guard to every 144 offenders at the Beto Unit. On any given day, the Department's operating strength is approximately 76-77 percent. The Department does not have the space or security resources to properly supervise all of the faith groups, if the groups are allowed to

---

[8] *See supra* note 7.

[9] *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part, vacated in part*, 679 F.2d 1115 (5th Cir.), *amended in part*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983).

congregate without an approved volunteer.  Allowing the Muslims to congregate without an approved volunteer has been a burden on the Department's security resources.

Bill Pierce, Director of Chaplaincy Operations for the Department, testified African Hebrew Israelites are not recognized at the Department as a separate faith and instead are grouped together with other Sabbatarian groups.  Due to time and space constraints, faiths are grouped together if the basic tenets of the religion are the same.  Pierce believes, if McKennie is allowed to meet on Saturdays without an approved volunteer, all of the other individual faith groups would want equal treatment.

There are approximately 3400 offenders confined at the Beto Unit.  Of those, 24 are considered Hebrew Israelites.  The size of the religious group is a factor when scheduling religious programs.  Larger groups are granted more time than smaller groups.

Pierce and others in the Chaplaincy Department regularly attempt to recruit volunteers to lead religious services at the prison.  They have not been successful in recruiting a Hebrew Israelite volunteer to lead services on the Sabbath.  They have not tried to recruit a Sabbatarian from a different faith to volunteer to lead services on the Sabbath.

## III.    Food-Services Policy

McKennie next challenges the Department's food-services policies which do not provide McKennie with a vegan-tray option.  McKennie testified that Sar Malahk taught him the religious importance of eating a vegan diet.  Sar Malahk confirmed Hebrew Israelites are required to eat a vegan diet. He claims this belief is based on Genesis 1:29.  Sar Malahk understands some members of his faith change to a vegan diet gradually.  He indicates in the "free world" there are several teaching tools available to teach religious followers how to transition to a vegan diet.  Those tools

are not available in prison.  Sar Malahk indicated it is not uncommon for members of his faith to eat fish and chicken while they transition to a vegan diet.

McKennie believes he cannot properly practice his religion unless he is provided a vegan food tray.  McKennie admits the Department offers a vegetarian tray.  However, there are three options of the vegetarian tray.  Option one provides cheese, beans, and bread.  Option two provides one egg, peanut butter, jelly, and bread.  Option three provides peanut butter, jelly, bread, and beans. The cheese and egg are the only items to which McKennie objects.

McKennie supplements his meals with purchases from the commissary, because he feels hungry.  McKennie admits he has occasionally purchased nonvegan items from the commissary. Most recently McKennie purchased sardines in March 2011.

McAndrew testified 200-250 meals out of 2000 meals in a Florida prison qualify as a special diet.  Florida began providing a vegan tray in the 1980's.  The medical department at the prison unit prescribed a multivitamin for those inmates eating the vegan tray.  Florida inmates were provided a vegan tray much like inmates were provided a special tray for medical reasons.  McAndrew is of the opinion the cost of providing a vegan food tray is minimal.

Ashok Reddy Kuchukulla, Chief Dietician for the University of Texas Medical Branch Correctional Managed Health Care, testified on behalf of the Department.  Kuchukulla indicated he creates the master menus for the offenders in the Department.  According to Kuchukulla, an ovo-lacto-vegetarian diet was selected as a tray option, because a strict vegan tray would eventually lead to vitamin $B_{12}$ and calcium deficiencies.  Kuchukulla testified a healthy vegan diet would require a vitamin supplement.  Kuchukulla reviewed labels of food and vitamins sold in the commissary that could be purchased to supplement the ovo-lacto-vegetarian food tray.  Kuchukulla described the

various medical diets provided to offenders confined in the Department. Kuchukulla estimated approximately 10 percent of the prison population receives special medical diets.

Elizabeth Bruns, a registered dietician, testified as an expert witness on behalf of McKennie. Bruns agreed with Kuchukulla that a vegan diet can be supplied in prison if a multivitamin is provided.

The Beto Unit does not serve a religious-diet tray. However, most offenders' religious diets are accommodated by the food trays served by the unit. The only Sabbatarian faith group that requires a vegan diet is the African Hebrew Israelites. The other religions included in the Sabbatarian group require a kosher diet, which is made available to offenders at the Stringfellow Unit.

Beryl Bailey, Program Supervisor III for Laundry Food and Supplies at the Beto Unit, testified he helps develop the menus at the Beto Unit. Criteria for planning meals include: (1) color; (2) eye appeal; (3) fiscal constraints; (4) flavor; (5) utilizing seasonings to enhance flavor; (6) nutritional needs; (7) the likes and dislikes of the offenders; (8) availability of the products; (9) production equipment availability; (10) temperature; (11) texture; and (12) variety. The regular tray, pork-free tray, and ovo-lacto-vegetarian tray accommodate most religious diets. The ovo-lacto-vegetarian diet was selected, because it meets nutritional requirements and provides more variety than a vegan tray. The Department has not determined the cost of providing a vegan tray.

The medical department creates the menus for the medical diets. No special foods are purchased to prepare the medical diets. The time required to prepare a medical tray is similar to the time required to prepare a regular tray. Offenders may not request a medical diet. The medical diets are prescribed by the unit health-care provider.

APPLICABLE LAW

The Act, enacted by Congress in 2000, provides the government shall not impose a "substantial burden" on the religious exercise of a person confined to an institution unless the burden furthers "a compelling governmental interest" and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The "[Act] imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Mayfield v. Texas Dep't Criminal Justice*, 529 F.3d 599, 612 (5th Cir. 2008).

The threshold inquiry under the Act is whether the challenged governmental action substantially burdens the exercise of religion. *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007). This inquiry necessarily requires the court to answer two questions: (1) is the burdened activity "religious exercise," and if so (2) is the burden "substantial"? *See Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004). Under the first question, the Court must determine whether the practices McKennie requests permission to engage in are religious exercise–that is, whether "the religious practice[s] at issue [are] important to the free exercise of his religion." *Adkins*, 393 F.3d at 570 (stating that complainant under Act bears burden of proving religious practice is important to free exercise of religion); *see also Cutter v. Wilkinson*, 544 U.S. 709, 725, n. 13, 125 S. Ct. 2113 (2005) ("[Act] bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion [but] does not preclude inquiry into the sincerity of a prisoner's professed religiosity."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009) ("The practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion." (citing *Adkins*, 393 F.3d at 567)). In the present

-14-

case, the Department does not dispute that attending religious services and eating a vegan diet are religious exercises. The Department does, however, challenge the sincerity of McKennie's religious beliefs.

If the Court finds McKennie is sincere in his beliefs, the Court must consider whether McKennie's religious exercise is substantially burdened by Department regulations. The burden of proving the existence of a substantial interference with a religious exercise rests on the religious adherent. 42 U.S.C. § 2000cc-2(b). Although the term "substantial burden" is not defined in the statute itself, the Fifth Circuit has found a governmental action or regulation creates a substantial burden on religious exercise "if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins*, 393 F.3d at 567. Specifically,

> [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Id.* at 570 (internal citations omitted).

If the religious adherent satisfies this threshold requirement, the burden shifts to the institution to demonstrate that the challenged policies are the least restrictive means of furthering a compelling governmental interest. *Baranowski*, 486 F.3d at 124 (citation omitted). In making this determination, the court must give due deference "to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (citation omitted). The Act "is not meant to elevate accommodation of religious observances over

-15-

the institutional need to maintain good order, security, and discipline or to control costs."
*Baranowski*, 486 F.3d at 125 (citation omitted).

DISCUSSION

## I.   Sincerely Held Beliefs

After considering all of the evidence and testimony presented at trial, observing McKennie's
demeanor, and considering McKennie's credibility, the Court finds McKennie is sincere in his
religious beliefs.  McKennie's religious journey has taken years to develop and has resulted in
McKennie adopting the Hebrew Israelite religion.  McKennie sincerely believes he is required to eat
a vegan diet and must congregate for fellowship on the Sabbath.  Although McKennie's practice of
his faith has not been perfect, his religious beliefs are no less sincere.  Accordingly, the Court will
consider McKennie's challenges to the Department's volunteer- and food-services policies in turn.

## II.   Volunteer Policy

McKennie has failed to prove by a preponderance of the evidence that the failure to allow
him to congregate with others of the same faith on the Sabbath without an approved volunteer
imposes a "substantial burden" on religious exercise under the Act.

The requirement of an outside volunteer is uniform for all religious assemblies at the Beto
Unit, with the exception of Muslims, who are subject to a special court order. The Fifth Circuit has
reviewed the Department's volunteer policy under the Act on numerous occasions.  In *Mayfield v.
Texas Dep't of Criminal Justice*, 529 F.3d 599, 614-15 (5th Cir. 2008), the court held that the
availability of an outside volunteer only once every 18 months provided a reasonable basis for a fact
finder to conclude that the application of the Department's outside-volunteer policy imposed a
substantial burden on the prisoner's right to exercise his religion in violation of the Act. In *Newby*

-16-

*v. Quarterman*, 325 Fed. Appx. 345 (5th Cir. 2009), the court held there was a reasonable basis for a fact finder to conclude the outside-volunteer policy created a substantial burden on free exercise, where there was a total lack of Buddhist volunteers to conduct meetings.

In contrast is *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004), where the court held that the Department's requirement that an outside volunteer be present at religious services did not place a substantial burden on a plaintiff-prisoner's exercise of religion, because the record showed that the infrequency of religious services arose from the lack of volunteers, rather than any direct prohibition on services. In *Adkins* an outside volunteer was available to oversee Sabbath observances for members of the Yahweh Evangelical Assembly once a month. The circuit held the same in *Odneal v. Pierce*, 324 Fed. Appx. 297 (5th Cir. 2009). Similarly, in *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007), the court considered whether religious exercise was substantially burdened, where a prisoner was prevented from congregating with other Jewish inmates on many Sabbath and Jewish holy days. The court concluded the volunteer policy did not place a substantial burden on the free exercise of the Jewish faith because, on the days services were not provided, no rabbi or approved religious volunteer was available to lead the services.

In McKennie's case, it is undisputed that there is no Hebrew Israelite volunteer available to conduct services on the Sabbath at the Beto Unit. McKennie and officials at the Department have not attempted to obtain a volunteer from another Sabbatarian faith with similar beliefs to the Hebrew Israelites to conduct services on the Sabbath. The parties agree McKennie's need to congregate on the Sabbath could be met if a volunteer from another Sabbatarian faith could lead the service. After McKennie obtained Sar Malahk as a Hebrew Israelite volunteer for Tuesday congregations in 2007, he made no further effort in seeking a qualified volunteer to lead services on the Sabbath and did not

complain to prison officials that his religious-congregation needs were not being met. The volunteer policy is not directly denying McKennie Sabbath services. Accordingly, McKennie has not shown that the religious- volunteer policy substantially burdens his religious exercise.

Even if McKennie had proved the Department's volunteer policy substantially burdens his religious exercise, the Department proved by a preponderance of the evidence that the burden is nevertheless justified by a compelling government interest that is achieved through the least intrusive means. It is undisputed that the Department has a compelling governmental interest in the safety and the reasonably economical operation of its prison system. *See Sossaman v. Texas*, 560 F.3d 316, 334 (5th Cir. 2009), *aff'd*, —— U.S. ——, 131 S. Ct. 1651 (2011). It is a requirement of the Act, however, that these interests be furthered by the least restrictive means available. In this case the Department has discharged its burden of showing that denying McKennie's request to congregate on the Sabbath without an approved volunteer is the least restrictive means to further those interests.

Requiring an outside volunteer to conduct meetings or services, promotes prison security and public safety, fosters compliance with prison rules in religious programming, and permits offenders to grow in faith by exposing them to volunteers who are knowledgeable about their faith. In addition, the volunteer requirement avoids having an offender in a position of authority over another offender. As explained by the Department, granting McKennie an exemption to the religious-volunteer policy would open the door to other faith groups requesting similar exemptions. The evidence establishes there would not be enough space or staff to accommodate all such requests. Moreover, it is neither reasonable nor rational to require the Department to apportion additional space and personnel to accommodate McKennie's faith subgroup that comprises less than one percent of the unit's population and is one of at least 74 faith groups at the Beto Unit. The Act does

-18-

not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. Administrative Directive 07.30 is supported by a compelling interest in prison security and is narrowly tailored to achieve that interest.

**III.    Food-Service Policy**

McKennie has failed to prove by a preponderance of the evidence that the failure to provide him with a vegan food tray imposes a "substantial burden" on religious exercise under the Act. A substantial burden is one that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins*, 393 F.3d at 567.

On a day McKennie is provided option one of the vegetarian tray, he may not eat the cheese. On a day McKennie is provided option two of the vegetarian tray, he may not eat the egg. McKennie is not forced to eat the cheese or the egg and is not disciplined for his failure to do so. The vegetarian diet provided McKennie does not pressure him to modify his religious behavior. Rather, McKennie indicates he is hungry and not fully satisfied with his diet. However, McKennie is foregoing 100 calories and seven grams of protein when he is presented with tray-option one and 70 calories and seven grams of protein when he is presented with tray-option two.

McKennie has supplemented his diet with commissary purchases during his confinement at the Department. Although McKennie may have been uncertain in the past as to what constituted vegan food items, he has received training from Sar Malahk and is capable of purchasing vegan food items from the commissary. McKennie has also been educated as to the need for vitamin supplements, which are also available for purchase in the commissary. No evidence was presented that McKennie is indigent and unable to continue making commissary purchases. *See e.g. Patel v. U.S. Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008) (holding no substantial burden when inmate

could consume "Common Fare" kosher nonmeat meals and could purchase his own halal commissary meals).

Despite the education McKennie has received, he recently purchased from the commissary sardines, which clearly is not a vegan food item. In addition, McKennie admits he sometimes skips breakfast, because it is served too early. McKennie, who appeared at trial and appears to be well-nourished, can hardly complain that the Department's failure to provide him with a vegan substitute for the egg and cheese substantially burdens his religion when he supplements his diet with nonvegan food items and skips breakfast.

Moreover, the Department has proved its policy providing McKennie with an ovo-lacto-vegetarian tray and allowing him to not eat the cheese or egg and to supplement his diet with commissary purchases is the least restrictive means of furthering compelling governmental interests including prison security, controlling costs, and maintaining workable administrative procedures. The Beto Unit is charged with feeding 3400 offenders each day. The Department chose to provide three types of food trays to the offenders. Those trays include a meat tray, a pork-free tray, and a meat-free tray. An offender may select any of the three trays on any given day. The three trays advance the Department's compelling interest to serve offenders meals that are nutritionally sufficient at a cost that falls within the Department's financial constraints and to accommodate as many religious diets as possible while keeping administrative burdens and disruptions at a minimum. The Department chooses to provide an ovo-lacto-vegetarian diet, as opposed to a vegan diet, because it does not lead to vitamin and mineral deficiencies and allows for more variety. If the Department provides a vegan tray, the Department will have to monitor which inmates are eating the vegan tray on a regular basis. Those offenders will be at risk for a vitamin or mineral deficiency and will

require vitamin supplementation. The vitamin supplement will have to be prescribed by the medical department and dispensed by medical personnel. The Department has demonstrated offering three tray options, one of which is the ovo-lacto-vegetarian tray, is the least restrictive means of furthering the compelling governmental interest in providing a nutritionally adequate daily diet for 3400 offenders at the Beto Unit within the Department's administrative and financial constraints.[10]

### CONCLUSION

In accordance with the foregoing:

IT IS ORDERED that Plaintiff shall take nothing from the Defendants in this cause.

SIGNED this the 10th day of February 2012.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

---

[10] The Act does not require defendants to ignore financial and administrative constraints. The Supreme Court has stated that, in enacting the Act, Congress "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citation and internal quotation marks omitted).